```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/7/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TINA FORBES,

                Plaintiff,

-v.-

TRI-COUNTY CARE, LLC and JAPHE DELIAT,

                Defendants.

---

21 Civ. 01366 (JHR)

OPINION

JENNIFER H. REARDEN, District Judge:

On February 16, 2021, Plaintiff Tina Forbes brought this action for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*[1] Plaintiff alleged that she was discriminated against and terminated from her employment at Defendant Tri-County Care, LLC ("Tri-County," or the "Company") because she was pregnant. *See generally* ECF No. 7 (First Amended Complaint ("FAC")). Specifically, Plaintiff averred that she was dismissed in retaliation for complaining to Tri-County's human resources representative about Defendant Japhe Deliat, her supervisor, "attack[ing] and target[ing]" her when she informed him of her pregnancy. *See, e.g.,* FAC at ¶¶ 29, 36, 45, 78, 91, 100.[2] Pursuant to Federal Rule of Civil Procedure 56, Defendants moved for summary judgment. *See* ECF No. 57 (Mot.). The Court GRANTED Defendants' motion. ECF No. 81. This Opinion sets forth the context and bases for that ruling.

---

[1] This case was originally assigned to the Honorable Ronnie Abrams and reassigned to this Court in 2023.
[2] Plaintiff's Title VII claims were only asserted against Defendant Tri-County. *See* FAC ¶¶ 81-103. Plaintiff "voluntarily withdr[ew] her aiding and abetting claim against" Defendant Deliat in her opposition to this motion. ECF No. 69 (Opp. Br.) at 1.

## I. BACKGROUND

Except where otherwise noted, this section sets forth undisputed facts drawn from the parties' Rule 56.1 Statements. *See* ECF Nos. 63 (Defs. 56.1), 69-1 (Pl. 56.1), 78 (Defs. Suppl. 56.1).[3]

Tri-County is a care coordination organization sponsored by the New York State Hamaspik Association. Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 5. It offers services that "allow[] people with intellectual and developmental disabilities . . . to plan their needs in one place[,] . . . rather than having to coordinate with several agencies to access services." Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 5. Those services included care management and the coordination of residential and respite care, community habilitation, family supports, day services, self-directed care services, vocational services, and job coaching services. Defs. 56.1 ¶ 5. During the period of Plaintiff's employment, from March 25, 2019 to February 20, 2020, *id.* ¶ 3, Tri-County maintained three major corporate offices and numerous satellite locations, *id.* ¶ 15. The corporate offices were located in Albany (Upstate), Rockland County (Midstate/Hudson Valley Region), and New York City (Downstate). *Id.*; Pl. 56.1 ¶ 12.

---

[3] Plaintiff's Rule 56.1 Statement violates Local Civil Rule 56.1(b) in that it does not "include . . . correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party." Nevertheless, in analyzing the extent to which Plaintiff's Rule 56.1 Statement "properly address[ed] [Defendants'] assertion[s] of fact," Fed. R. Civ. P. 56(e)(2), the Court reviewed the entirety of that filing. Where Plaintiff's Rule 56.1 Statement did not "properly address [Defendants'] assertion[s] of fact," the Court "consider[ed] the fact[s] undisputed for purposes of the motion," *id.*, and cited only to Defendants' Rule 56.1 Statement. As for the declaration of Plaintiff's counsel, Tyrone Blackburn, *see* ECF No. 69-2 (Blackburn Decl.), it addresses a different version of the events at issue—events for which he was not present and of which he has no personal knowledge. Because "[a]n affidavit or declaration used to . . . oppose a motion [for summary judgment] must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), the Court "only construe[d] facts [from the Blackburn Declaration] in favor of plaintiff where the attorney affirmation [wa]s supported by exhibits containing evidence that would be admissible at trial." *Little v. City of New York*, 487 F. Supp. 2d 426, 433 n.2 (S.D.N.Y. 2007) ("The law is clear that an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment.").

On March 25, 2019, Plaintiff commenced work as a Training Specialist in Tri-County's Training and Education Department. Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 7. The Training and Education Department had three members, each assigned to one of Tri-County's three corporate offices. Plaintiff was assigned to New York City; Elisha Cunningham, another Training Specialist, was assigned to Albany; and Japhe Deliat, Plaintiff's "direct supervisor," was assigned to Rockland County. Defs. 56.1 ¶¶ 14-15; Pl. 56.1 ¶¶ 11-12.

As a Training Specialist, Plaintiff was tasked with traveling to and conducting training sessions at different Tri-County locations and with providing day-to-day support to Tri-County personnel. Defs. 56.1 ¶ 12. Her duties "included . . . conducting new employee orientation programs and 'IAM' ('It's All About Me') training sessions in which Plaintiff was required to teach Tri-County care managers how to perform assessments of and create life plans for clients." *Id.*; Pl. 56.1 ¶ 9.

Pursuant to Tri-County policy, the first ninety days of employment are considered a probationary period during which an employee is observed and evaluated by his or her immediate supervisor. Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 13. Plaintiff "did not successfully complete her initial probationary employment period." Defs. 56.1 ¶ 18. Plaintiff's performance review thereafter stated that she "need[ed] improvement" in the areas of training effectiveness, organizational skills, and accountability; that she had yet to "grasp[] all methods and training materials necessary to fulfill her role as a Training Specialist"; and that she had "struggle[d] to meet the comprehensive needs of her position." ECF No. 58 (Kornbluh Decl.) Ex. 3 (Ninety Day Evaluation). Deliat then extended Plaintiff's probationary period by forty-five days. Defs. 56.1 ¶ 18; *see also* Pl. 56.1 ¶¶ 14-15.'" According to Plaintiff, "poor training on the part of Deliat . . . delayed [her] understanding of . . . the three deliverables and systems needed to

3

execute her role." Pl. 56.1 ¶ 14.[4]  Ultimately, following the forty-five-day extension, Plaintiff completed her probationary period.  Defs. 56.1 ¶ 20; Pl. 56.1 ¶ 17.

As of June 20, 2019, Plaintiff was seeking to transfer from Tri-County's Long Island City Office to its Lawrence Office.  Defs. 56.1 ¶ 54.  Her request was conveyed to Blimi Kornbluh, Vice President of Human Resources, who denied it on the grounds that (1) the Lawrence office, which was a satellite office, primarily served care managers, and (2) "Plaintiff would not have been able to carry out her job functions if she worked at this location." *Id*. ¶ 55.  Specifically, "[a]s the majority of Tri-County's Downstate employees worked out of the Long Island City office, it had a greater need [than Lawrence] for an in-person Training Specialist to provide training and support." *Id.*  A trainer in the Lawrence office would not have had a substantial role. *Id*.

In late 2019, Plaintiff "continued to struggle in meeting the expectations of the Training Specialist position," *id.* ¶ 20, and by "December 2019[,] Mr. Deliat and Ms. Cunningham had assumed a significant percentage of Plaintiff's training duties," *id.* ¶ 21.[5]  By December, Tri-County's management was discussing "Plaintiff's performance and her contributions, or lack thereof, to the Training and Education Department," *id.* ¶ 22, raising concerns about her future

---

[4] Defendants argued that the description "poor" was "based on Plaintiff's subjective opinion and personal beliefs." Defs. Suppl. 56.1 ¶ 14.  "Although the parties disagree[d] as to the characterization . . . afforded to [these] facts, they do not present any genuine disputes of material fact." *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 406 (S.D.N.Y. 2005), *aff'd sub nom. Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d Cir. 2008).

[5] In opposition, Plaintiff contended that "[s]he excelled in her role, to the point that Deliat referred to her as an asset to the organization." Pl. 56.1 ¶ 18.  But in doing so, Plaintiff mischaracterized the document on which she relied—a February 19, 2020 email from Deliat to Kornbluh.  In that communication, although Deliat observed that Plaintiff "ha[d] been an asset with a lot of the administrative responsibilities and scheduling of trainings independently," he also stated that Plaintiff was "not as much of a support to the workforce as [he] anticipated she would be," and that "we don't feel her delivery of trainings is as good as it needs to be." Kornbluh Decl. Ex. 7 (Feb. 19, 2020 E-Mail) at 5.

4

with the organization, *id.* ¶ 23.  On December 13, 2019, for instance, Jason Mazzuca, Vice President of Care Management, emailed Deliat:

> I want to have a discussion next week about Tina and what her role is within the department.  I see you and Ellie [Cunningham] doing a lot of work and a lot of projects, but I am not getting a sense of what Tina is responsible for on a weekly basis.  Her calendar is sparse to say the least.  We need to ensure that we are using our resources adequately.  We have a ton on our plate and I can't have you and Ellie unnecessarily shouldering the burden.

Kornbluh Decl. Ex. 4 (Dec. 13, 2019 E-Mail).  Mazzuca "advised Mr. Deliat that Plaintiff's work performance required immediate improvement."  Defs. 56.1 ¶ 24; *see also* Pl. 56.1 ¶ 22.

"By early February 2020, it became evident to Mr. Mazzuca that Plaintiff's performance issues had not improved and she was not capable of performing the core functions of the Training Specialist position."  Defs. 56.1 ¶ 25.  Mazzuca then "brought his concerns regarding Plaintiff's performance directly to [Kornbluh], and his direct supervisor, Ms. Nechama Nissenbaum, the Vice President of Operations at Tri-County."  *Id.* ¶ 26.

At some point prior to February 12, 2020, Plaintiff renewed her June 2019 request to transfer to the Lawrence Office, *id.* ¶ 56, due to a change in her childcare arrangements, Kornbluh Decl. Ex. 5 (Mazzuca Memo.).  On February 12, 2020, Mazzuca and Deliat met to discuss Plaintiff's transfer request and her future role at the Company.  *See id*.  According to a memorandum written the following day, February 13, 2020, Mazzuca "did not find that approving [Plaintiff's transfer] request was in the best interest of [Tri-County]."  *Id*.  He "still ha[d] not been provided with a clear picture of" Plaintiff's daily responsibilities.  *Id*.  Moreover, Mazzuca had not personally observed Plaintiff aiding care managers at their cubicles, as he had witnessed Deliat and Cunningham doing, and instead had received reports that Plaintiff spent most of her time in her office.  *Id*.  In addition, Mazzuca had found Plaintiff's training sessions to consist of reading off of slides, which was "not an effective training."  *Id*.  Mazzuca and Deliat

5

"discussed that it might be time to explore other options within [Tri-County] for [Plaintiff] outside of the Training department." *Id*. They decided that if Plaintiff were receptive to changing roles within the organization—that is, if she were "in agreement with this decision to transfer to a CM position,"[6] and if "there [were] availability in Lawrence"—then "she could transfer in that role," *id*.

On February 13, 2020, Mazzuca also noted his concerns regarding Plaintiff's performance in "e-mail correspondence" to Kornbluh and Nissenbaum. Defs. 56.1 ¶ 29. Mazzuca reiterated that he did "not . . . support [] approving [Plaintiff's] transfer to another office location in her current role" but mentioned her "transfer[] to a CM role" as a "possibility." Kornbluh Decl. Ex. 6 (Feb. 13, 2020 E-Mail). In addition, Mazzuca proposed "immediately" "restructur[ing]" the position then held by Plaintiff so that "it [was] more in line with what [Cunningham was] providing in her current role"—he "want[ed] a Training Specialist in the 5 boroughs who w[ould] divide their time amongst ALL of the offices there." *Id*. At first, Mazzuca stated that he did not want Deliat, a Director, "visiting offices to conduct the duties that [Plaintiff] should have been doing." *Id*. But that same day, as discussions continued, Mazzuca and Kornbluh concluded that Mr. Deliat and Ms. Cunningham could "absorb Plaintiff's remaining duties [beyond in person training], which comprised limited administrative work." Kornbluh Decl. ¶ 37.

By February 13, 2020, "Mazzuca and Kornbluh [had] concluded that the Training and Education Department would undergo a restructuring that would result in the elimination of one Training Specialist position." *Id*. ¶ 39. Because of "Plaintiff's ongoing performance issues and because she was the least performing employee within the Training and Education Department,"

---

[6] The parties use "CM" to refer to the care manager position.

Mazzuca and Kornbluh "determined that Plaintiff's position would be eliminated as a part of the restructuring." Defs 56.1. ¶ 31.

Rather than immediately terminate Plaintiff's employment, Mazzuca and Kornbluh agreed, as Mazzuca and Deliat had previously discussed, *id.* ¶ 28, that Plaintiff would first be offered a new role within Tri-County—that of care manager, *id.* ¶ 32. If Plaintiff turned down the care manager position, then "her employment would be terminated following the restructuring." *Id.*

On February 17, 2020, four days after Mazzuca and Kornbluh had decided to eliminate Plaintiff's position, Plaintiff informed human resources officer Sara Bucknal that she was pregnant. *Id.* ¶ 39; Pl. 56.1 ¶ 52. Bucknal advised Plaintiff to inform her direct supervisor, Deliat. Blackburn Decl. Ex. E. (Bucknal Aff.) at 2.[7] That same day, Deliat "personally met with Plaintiff to offer her the transfer to the care manager position," which she turned down. Defs. 56.1 ¶ 38. During that conversation, Plaintiff informed Deliat that she was pregnant. *Id.* ¶ 39. Deliat allegedly "asked very personal questions related to [Plaintiff's] child's father, her age, and her plans [for] dealing with two small children moving forward," which Plaintiff reported to Bucknal. Bucknal Aff. at 1; *see also* Defs. 56.1 ¶ 42 ("[O]n February 17, 2020, [Plaintiff] also allegedly made a verbal complaint solely to Ms. Bucknal about alleged comments made by Mr. Deliat."). There is no evidence that Bucknal or Deliat disclosed Plaintiff's pregnancy to the relevant decisionmakers at Tri-County until February 21, 2020, at the earliest. Defs. 56.1 ¶ 41.[8]

---

[7] Although Bucknal stated that she was "in disbelief" on February 21, 2020 regarding Plaintiff's termination, her affidavit does not address any events prior to that date—including the decisionmakers' communications on February 12 and 13, 2020 that had culminated in a decision to eliminate Plaintiff's position and to dismiss her.

[8] In any event, it is undisputed that no one in the organization was aware of Plaintiff's pregnancy when the decision to restructure her position and to terminate her employment was made on February 13, 2020.

On February 19, 2020, Deliat e-mailed Kornbluh and Mazzuca to inform them that Plaintiff had rejected the care manager position. *Id.* ¶ 45; *see also* Pl. 56.1 ¶ 46; Kornbluh Decl. Ex. 7 (Feb. 19, 2020 E-Mail). Kornbluh replied that "[i]t seems that we are going towards a termination and the simple reason can be due to department restructuring." *Id.* at 5. The group agreed that Deliat and a representative from human resources would meet with Plaintiff on February 21, 2020. *See id* at 3-4.

On February 21, 2020, Deliat met with Bucknal to discuss Plaintiff's termination. Defs. 56.1 ¶ 50; Pl. 56.1 ¶ 57. Bucknal then texted with Kornbluh for guidance on how to "draft and format" Plaintiff's termination letter. Defs. 56.1 ¶ 50; Pl. 56.1 ¶ 57. The two agreed to use the word "restructure" rather than "lay-off." Kornbluh Decl. Ex. 9 (Feb. 21, 2020 Text Exchange) at 2.[9] During their exchange, Bucknal informed Kornbluh that Plaintiff was pregnant. *See id.* at 4. Kornbluh responded "[o]ooh! Didn't know. . . . This is absolutely nothing related to that," to which Bucknal replied, "I didn't think it was related to that." *Id.* at 4-5. Deliat then met with Plaintiff and explained that her employment was being terminated due to a departmental restructuring. Defs. 56.1 ¶ 49. He provided her with a termination letter reflecting the same. *Id.* Consistent with Deliat's explanation, Tri-County did not fill Plaintiff's position after terminating her employment. *Id.* ¶ 52.

---

[9] Plaintiff contradicts herself in contending that (1) Kornbluh "came up with the excuse of 'departmental restructuring' on February 19, 2020, Pl. 56.1 ¶ 50 (citing Feb. 19, 2020 E-Mail), and then that (2) "Bucknal, *NOT* Kornbluh," "suggested two possible excuses to use as the reason for [Plaintiff's] termination: Lay-off or restructuring the department," *id.* ¶ 58 (citing Feb. 21, 2020 Text Exchange). Regardless, use of the term "restructuring" dates to at least the February 13, 2020 e-mail from Mazzuca to Kornbluh and Nissenbaum. *See* Feb. 13, 2020 E-Mail ("I am proposing that [Deliat] restructure[ ] [Plaintiff's] position so that it is more in line with what [Cunningham] is providing in her current role.").

8

On April 28, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), *see* ECF No. 59 (Zwerling Decl.) Ex. 13 (EEOC Charge), and on February 16, 2021, she initiated this action, *see* ECF No. 1.  Plaintiff amended her Complaint on March 14, 2021.  *See* FAC.  Following the close of discovery, Defendants moved for summary judgment.  *See* Mot.

## II. LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence, in conjunction with the pleadings, demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).

When considering a motion for summary judgment, the Court "constru[es] all the evidence in the light most favorable to the non-movant," *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)), and "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," *Roe*, 542 F.3d at 35 (quoting *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001)).  But the non-moving party "cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  She must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

9

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (reversing circuit court's affirmance of denial of summary judgment).

### III. DISCUSSION

Plaintiff asserted claims for discrimination and retaliation under Title VII and the New York State Human Rights Law. All four claims were premised on Tri-County having terminated Plaintiff after she told company employees that she was pregnant.[10] The undisputed evidence shows, however, that Tri-County had decided to terminate Plaintiff before anyone at the Company learned of her pregnancy. On that basis, Plaintiff's claims were dismissed.

### A. Discrimination

#### 1. Title VII

As relevant here, Title VII makes it unlawful "for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The phrase "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k).

Claims under Title VII are analyzed pursuant to the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): "[O]nce a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate

---

[10] In her opposition brief, Plaintiff alleged for the first time that "Defendant's [sic] decision to terminate [her] within four days of her pregnancy accommodation request" could have been "a direct result of . . . *race* discrimination." ECF No. 69 (Opp. Br.) at 7 (emphasis added). In contrast, the Amended Complaint avers that "Plaintiff has suffered as a result of being discriminated against and retaliated against and ultimately terminated by her employer *solely due to her pregnancy as well as her sex/gender*." FAC ¶ 2 (emphasis added). Because Plaintiff "raise[d] this [race discrimination] claim for the first time in her opposition papers to the instant motion," the Court did "not consider this claim as a basis for liability here." *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 489 n.32 (S.D.N.Y. 2009).

some legitimate, nondiscriminatory reason for the employer's action against the employee. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 177 (2d Cir. 2023) (quoting *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86-87 (2d Cir. 2022)). In other words, where the employer offers a nondiscriminatory reason for its action, "the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (quoting *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005)) (cleaned up). "The plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Carr*, 76 F.4th at 177 (quoting *Tex. Dep't of Cmty. Affs. V. Burdine*, 450 U.S. 248, 256 (1981)). Here, Plaintiff failed to sustain that burden.

To establish a *prima facie* case of discrimination, Plaintiff had to "show (1) that she [wa]s a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, ha[d] (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

There is no debate that Plaintiff established the first and third elements of a *prima facie* case. Plaintiff was "a member of a protected class" (i.e., she was pregnant). *See id.*; 42 U.S.C. § 2000e(k). And she "suffered an adverse employment action" (i.e., she was terminated). *Littlejohn*, 795 F.3d at 307. Instead, Defendants argued that Plaintiff had "failed to proffer sufficient evidence demonstrating she was qualified as a Training Specialist, let alone to contradict the proof submitted . . . by Tri-County," and that there is "no inference of discrimination . . . where an employer makes the decision to eliminate an employee's position

11

prior to learning of her pregnancy." ECF No. 62 (Defs. Br.) at 16, 20-21.  As detailed below, a reasonable jury could, in fact, find that Plaintiff was "qualified for employment in the position." *Littlejohn*, 795 F.3d at 307.  Plaintiff did not, however, offer "minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Id*.

### a. Plaintiff's Qualification for Employment

"To show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (quotation marks omitted). Indeed, "[i]n a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Id*.

There are "circumstances in which a plaintiff's performance is so manifestly poor as to render her unqualified for continued employment and thereby defeat her *prima facie* case." *Id.* at 697 n.7 (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997) (concluding, on summary judgment, that no *prima facie* case had been made out where, following a probationary period, the employer rated plaintiff's work unsatisfactory on a majority of criteria, and plaintiff did not contest most of those ratings)).  But "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that [s]he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).

A reasonable jury could find that Plaintiff was "minimally qualified" for the Training Specialist position. *See Gregory*, 243 F.3d at 696.  To be sure, her qualifications were in some doubt.  For instance, Mazzuca (1) had "not personally observed" Plaintiff "aiding" care managers at their cubicles, as distinct from Deliat and Cunningham, (2) had received reports

"that [Plaintiff] spen[t] most of the time in the office that she share[d] with supervisors," and (3) found Plaintiff's training classes to consist of her reading off slides, which he felt was "not an effective training." Mazzuca Memo. Roughly six months earlier, however, Tri-County had "expressed a belief"—when Plaintiff's probationary employment period was deemed completed—"that [Plaintiff] was minimally qualified." *Gregory*, 243 F.3d at 696; *cf. id.* at 697 n.7 (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997)) (holding that plaintiff was not minimally qualified where, "after a probationary period, the employer rated plaintiff's work unsatisfactory"). Specifically, although Plaintiff did not complete the probationary period in her initial ninety days due to shortcomings in training effectiveness, organizational skills, and accountability, Defs. 56.1 ¶ 19; Pl. 56.1 ¶¶ 14-15, she ultimately did so following a forty-five-day extension, Defs. 56.1 ¶ 20; Pl. 56.1 ¶ 17. Accordingly, a reasonable jury could find that Plaintiff "possesse[d] the basic skills necessary for performance of [the] job." *Slattery*, 248 F.3d at 92 (quoting *Owens v. N.Y.C. Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)) (second alteration in original).

### b. Inference of Discriminatory Motive

Plaintiff did not, however, provide "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307. The timing of the termination decision is relevant. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 88 (2d Cir. 2005) (affirming grant of summary judgment where employer's knowledge of Plaintiff's pregnancy at the time of an adverse employment decision was in fact "mere speculation") (quotation omitted). It is well established "that a defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant." *Id.* at 82. "To defeat summary judgment," Plaintiff was "obliged to do more than produce evidence that *someone* at [the Company] knew [she was pregnant]. She was obliged to offer evidence

13

indicating that persons who actually participated in her termination decision had such knowledge." *Id*. at 87; *see also Stainkamp v. Changes Int'l of Fort Walton Beach, Inc.*, 373 F. Supp. 2d 163, 166 (E.D.N.Y. 2005) (quoting *Woodman*, 411 F.3d at 83) (Where "the employer claims that the decision to terminate was made prior to learning of the plaintiff's protected status, the plaintiff must also 'adduce some evidence, whether direct or indirect, indicating a defendant's knowledge' of the plaintiff's membership in the protected class.").

Plaintiff "failed to adduce any evidence that [Kornbluh or Mazzuca were] aware of her pregnancy at the time [they] made the decision [on February 13, 2020] to terminate her, and she . . . therefore failed to establish a *prima facie* case." *Id*. at 167. In conversations on February 17, 2020, Plaintiff informed Bucknal and Deliat that she was pregnant. Defs. 56.1 ¶ 38-39; Pl. 56.1 ¶ 52. Prior to those discussions, "on February 13, 2020, Mr. Mazzuca and [Ms. Kornbluh] [had] decided that the Training and Education Department would undergo a restructuring that would result in the elimination of one Training Specialist position. Naturally, given Plaintiff's poor work history which consisted of subpar performance, as of that same date, Mr. Mazzuca and [Ms. Kornbluh] further determined that Plaintiff's position would be eliminated" as part of the restructuring of the Training and Education Department. Kornbluh Decl. ¶ 9; *accord* ECF No. 80-1 (Mazzuca Decl.) ¶ 10 ("Ms. Kornbluh and I concluded that Mr. Deliat and Ms. Cunningham could . . . absorb Plaintiff's remaining duties, which comprised limited administrative work. Following this assessment, as of February 13, 2020, Ms. Kornbluh and I concluded that the Training and Education Department would undergo a restructuring that would result in the elimination of one Training Specialist position. As Plaintiff was the least performing employee, and contributed the least to the Training and Education Department's

functions, Ms. Kornbluh and I further decided that we would eliminate her position as part of the restructuring.").[11]

Plaintiff correctly observed that "e-mail correspondence to Kornbluh and Ms. Nissenbaum," the Vice President of Operations, "did not indicate any desire to terminate [her] employment." Pl. 56.1 ¶ 34. Those records are, however, consistent with Kornbluh and Mazzuca's declarations in that they discuss offering Plaintiff the "option to transfer to a CM position" in Lawrence. Mazzuca Memo; *cf. Stainkamp*, 373 F.Supp.2d at 167-68 (holding that plaintiff could not sustain her burden where "documentary evidence"—an exhibit to an affidavit—reflected that "the decision to terminate" occurred on a specific date, and plaintiff provided no evidence that any of her managers knew before then that she was pregnant). In particular, on February 12, 2020, Mazzuca and Deliat had discussed that, due to Plaintiff's performance, including "spen[ding] most of her time in the office she shared with supervisors" instead of "aiding care managers at their cubicles, as . . . Deliat and Cunningham had do[ne]"— and conducting "training classes [that] consist[ed] of her reading off slides"—"it might be time

---

[11] Although Plaintiff maintained that Deliat was also "a decision maker," Opp. Br. at 23, Mazzuca attested that he and Kornbluh "were the *sole* decision-makers involved in the process leading up to the restructuring of the Training and Education Department and Plaintiff's termination" and that Deliat "was *not* a decision-maker, nor was he involved in the decision-making process." ECF No. 76 (Mazzuca Reply Decl.) ¶ 7 (emphasis added). Moreover, Deliat himself declared that he "was apprised of the decision-makers' determinations on an as-needed basis" because he "was not involved in the decision-making process" and "had no authority to terminate any employee." ECF No. 61 (Deliat Decl.) ¶ 9. Indeed, as of February 19, 2020, Deliat apparently still believed that Plaintiff would be replaced at Tri-County, even though Kornbluh and Mazzuca had already decided not to replace her. *See* Feb. 19, 2020 E-Mail at 5 ("I thought of maybe making it an ultimatum instead of an option but I am not sure if she meets all the qualifications to be a CM. That way we can begin our search for a more dynamic Training Specialist to replace her."). Deliat's mistaken belief lasted until at least February 24, 2020. *See* Mazzuca Reply Decl. ¶¶ 8-9 ("A few days after Plaintiff's termination, . . . [Deliat] wished to discuss the possibility of filling Plaintiff's position. It was apparent that Mr. Deliat had not yet grasped that the restructuring of the Training and Education Department entailed the complete elimination of one Training Specialist position."); *see also* Blackburn Decl. Ex. D (Feb. 24, 2020 E-Mail).

15

to explore other options within [Tri-County] for [her] outside of the Training department." Mazzuca Memo. And the next morning, Mazzuca informed Kornbluh and Nissenbaum that he "immediately" wanted to "restructure[]" Plaintiff's "position so that it [was] more in line with what [Cunningham was] providing in her current role." Feb. 13, 2020 E-Mail. Because of "Plaintiff's ongoing performance issues and because she was the least performing employee within the Training and Education Department," Mazzuca and Kornbluh "determined that Plaintiff's position would be eliminated as a part of the restructuring." Defs. 56.1 ¶ 31.

According to Plaintiff, the decision to terminate her was not made until February 19, 2020, after Deliat and Bucknal were aware that she was pregnant. Pl. 56.1 ¶¶ 47, 50 (citing Feb. 19, 2020 E-Mail). The e-mail thread adduced by Plaintiff does not suggest that the decision was made that day, however. Instead, it shows that Plaintiff would indeed be terminated because she had declined the care manager position on February 17, 2020, and there were no "other [alternative] positions to suggest." Feb. 19, 2020 E-Mail at 4. Even if the final decision to dismiss Plaintiff had been made on February 19, 2020, neither Mazzuca nor Kornbluh knew then that Plaintiff was pregnant. Defs. 56.1 ¶ 37. Plaintiff argued that it was "*reasonable to assume that Deliat [had] reported [her] pregnancy to Mazzuca on or about February 19 to 21, 2020*," because Bucknal's "affidavit state[d] that Deliat told her . . . that [Plaintiff's] pregnancy announcement and her request for reasonable accommodations [had] upset management, which triggered [Plaintiff's] termination." Opp. Br. at 22 (emphasis added). "A party, however, cannot overcome summary judgment by relying on 'mere speculation or conjecture as to the true nature of the facts.'" *Fappiano v. City of New York*, 640 F. App'x 115, 117 (2d Cir. 2016) (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir.2013) (per curiam)). Bucknal's affidavit does not explicitly state that Deliat discussed Plaintiff's pregnancy with anyone. In contrast, it references only Deliat's report that Plaintiff's request for an accommodation—the

16

transfer to the Lawrence office—"seemed to have triggered a negative response." Bucknal Aff. at 2-3. And Deliat's uncontroverted, sworn declaration provides that Deliat "did not disclose Plaintiff's pregnancy to any other Tri-County employee," including Mr. Mazzuca and Ms. Kornbluh, until "Plaintiff's termination had already occurred." *See* Deliat Decl. ¶ 24; *see also id.* ¶ 11.

Accordingly, Plaintiff did not establish a *prima facie* case of discrimination, and her Title VII discrimination claim was dismissed.

### 2. NYSHRL

"Until October 11, 2019, discrimination claims under the NYSHRL and Title VII were generally treated as analytically identical, and addressed together." *Edelman v. NYU Langone Health Sys.*, No. 21 Civ. 502 (LGS), 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (quotation marks omitted). But following a 2019 amendment, "[f]or claims that accrued on or after the effective date of the legislation[,] . . . 'the standard for [NYSHRL] claims [is] closer to the standard of the" New York City Human Rights Law ("NYCHRL"). *Id.* (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)) (third and fourth alterations in original). The NYCHRL is less demanding than Title VII: Plaintiff may prove an adverse employment action simply by showing that she was treated "less well." *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 390 (2d Cir. 2020) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)).

Plaintiff's NYSHRL claim nevertheless failed for the same reason as her Title VII claim: She did not show that she was treated "less well . . . *because of a discriminatory intent*." *Mihalik*, 715 F.3d at 110 (emphasis added).

### B. Retaliation

When Plaintiff told Deliat that she was pregnant, he allegedly "asked very personal questions related to [Plaintiff's] child's father, her age, and her plans [for] dealing with two small children moving forward"—questions Plaintiff reported to Bucknal. Bucknal Aff. at 2.[12] In opposing this motion, Plaintiff contended that her termination was in retaliation for complaining to Bucknal about Deliat's "negative and inappropriate reaction" upon learning that she was pregnant. Opp. Br. at 25.

Plaintiff's retaliation claims failed for substantially the same reason as her discrimination claims: The decision to terminate her employment was made before anyone at Tri-County knew she was pregnant. In other words, that decision could not have been in retaliation for her complaining about Deliat's comments regarding her pregnancy.

### 1. Title VII

As an initial matter, Plaintiff did not exhaust her administrative remedies with respect to her Title VII retaliation claim. "Before bringing a Title VII suit in federal court, an individual must first present the claims forming the basis of such a suit in a complaint to the EEOC or the equivalent state agency." *Littlejohn*, 795 F.3d at 322 (cleaned up). "[C]laims not raised in an EEOC complaint may still be part of the complaint later filed in federal court if they are 'reasonably related' to the claim filed with the agency." *Id.* (cleaned up). Claims are "reasonably related":

> 1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; 2) where the complaint is one alleging retaliation by an employer

---

[12] In her opposition brief, Plaintiff also alleged that she "complained of discrimination to Mr. *Monteleone*" and made complaints to "*Liggins*, then Director of the human resources department, and . . . *McKeon*, the President of the human resources department." Opp. Br. at 20 (emphasis added). In addition, she repeatedly referenced interactions dating to 2012 with "*Medepalli*." *See id.* at 23-28 (emphasis added). It is not clear to whom Plaintiff was referring—none of those names appears in the First Amended Complaint, in any of the Rule 56.1 Statements, or in the parties' briefing.

18

>against an employee for filing an EEOC charge; and 3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

*Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (cleaned up).

Plaintiff's EEOC charge made no reference to retaliation: It "contained no indication that she believed she had been terminated in retaliation for complaining about [Deliat's] treatment. Indeed, the administrative complaint [did] not say that Plaintiff complained at all." *Henny v. New York State*, 842 F. Supp. 2d 530, 558 (S.D.N.Y. 2012) (granting summary judgment for defendants). And Plaintiff's "retaliation claim was not 'reasonably related' to [her] discrimination charge," *id.* at 559 (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 76, 78 (2d Cir. 2008)), because "[w]here the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive," *Gambrell v. Nat'l R.R. Passenger Corp.*, No. 01 Civ. 6433 (NRB), 2003 WL 282182, at *8 (S.D.N.Y. Feb. 3, 2003).

Even if Plaintiff had exhausted her administrative remedies relating to her retaliation claim, summary judgment still would have been appropriate. Retaliation claims under Title VII are analyzed using the same burden-shifting framework outlined above. *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). To establish a *prima facie* case of retaliation, Plaintiff must "offer[] evidence that she participated in a protected activity, suffered an adverse employment action, and that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Id.* (quotation marks omitted). For the same reasons set forth above—namely that the decision to terminate Plaintiff was made before the decisionmakers knew she was pregnant—Plaintiff did not "offer[] evidence" of "a causal connection between her engaging in the protected activity" (i.e., making an internal complaint to Bucknal) "and the adverse employment action" (i.e., her termination). *Id.*

19

### 2. NYSHRL

"The 2019 amendment" to the NYSHRL "also . . . relaxed the standard for NYSHRL retaliation claims." *Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043 (JPC), 2023 WL 5629295, at *14 (S.D.N.Y. Aug. 31, 2023). Applying the more liberal standard from the NYCHRL, *see supra* at 17, Plaintiff's claim still failed.

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citation omitted). As previously explained, however, Plaintiff did not show a "causal connection between an adverse act and a protected activity." *Dudley v. N.Y.C. Hous. Auth.*, No. 12 Civ. 2771 (PGG), 2014 WL 5003799, at *25 (S.D.N.Y. Sept. 30, 2014); *see also Mihalik*, 715 F.3d at 113 ("[A] defendant is not liable [under the NYCHRL] if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives.").

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTED Defendants' motion for summary judgment. The Clerk of Court is directed to vacate the Judgment at ECF No. 81, issue a new Judgment consistent with this Opinion, and close the case.

SO ORDERED.

Dated: March 7, 2025
      New York, New York

*[Signature]*
JENNIFER H. REARDEN
United States District Judge